IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| DEL RAY SANDERS | § | |
| VS. | § | CIVIL ACTION NO. 9:14cv9 |
| DIRECTOR, TDCJ-CID | § | |

## MEMORANDUM OPINION

Petitioner Del Ray Sanders, an inmate confined within the Texas Department of Criminal Justice, Correctional Institutions Division, proceeding *pro se,* filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## Factual Background

An indictment was returned charging petitioner with murder. Following a jury trial in the 411th District Court of Polk County, Texas, petitioner was convicted of the offense with which he was charged. He was sentenced to life imprisonment. The conviction was affirmed by the Texas Court of Appeals for the Ninth District. *Sanders v. State*, No. 09-10-00047-CR (Tex.App.-Beaumont, 2011). The Texas Court of Criminal Appeals dismissed a petition for discretionary review as improvidently granted. Three justices dissented from the refusal. *Sanders v. State*, PDR No. 0849-11.

Petitioner subsequently filed a state application for writ of habeas corpus. The Court of Criminal Appeals denied the application without written order.

## Grounds for Review

Petitioner asserts the following grounds for review: (a) the trial court erred in denying his request for jury instructions on the lesser included offenses of manslaughter and negligent homicide; (b) the trial court erred by requiring him to admit to murder in order to receive jury instructions regarding manslaughter and negligent homicide; (c) the trial court erred by admitting hearsay evidence; (d) there was prosecutorial misconduct based on: (1) erroneous use of extraneous offense evidence; (2) erroneous reference to a possible confession; (3) erroneous misstatement of the law;

(4) willful failure to turn over photographs; (5) racial comments and implications of extraneous racist conduct; and (6) erroneous characterization of petitioner as evil; (e) he received ineffective assistance of counsel at trial because counsel: (1) failed to request a change of venue; (2) failed to strike a biased juror; (3) failed to interview and call witnesses; and (4) failed to investigate and prepare a meaningful trial strategy; and (f) he received ineffective assistance of counsel on appeal because counsel: (1) failed to argue there was ineffective assistance of counsel at trial and (2) failed to argue that there was insufficient evidence to support the conviction.

## Evidence at Trial

The intermediate court summarized the evidence at trial as follows:

Sanders was married to Linnie Jo Sanders. At trial, witnesses testified that Linnie and Sanders both abused prescription drugs. Witnesses testified that Linnie sometimes fell when under the influence, but other witnesses testified that Linnie never fell when under the influence. The record contains testimony that Sanders was mellow when taking pre-cription medication, but other testimony shows he was aggressive. Witnesses testified that Sanders was abusive towards Linnie, Linnie was submissive and fearful, and Linnie sought a protective order against Sanders.

Sanders testified to the events preceding Linnie's death. Sanders testified that he saw Linnie run through the house and fall on a loose floor tile. Sanders unsuccessfully tried to lift Linnie. Sanders dragged Linnie to the couch, but Linnie fell face down on the coffee table. Sanders knew that Linnie had a prior neck injury. Sanders dragged Linnie to the bedroom, but fell into the paneled wall with Linnie. Sanders called Linnie's mother and followed her advice to put Linnie to bed. Sanders put Linnie to bed, took some pills and went to sleep. During the night, Sanders awoke to find the bed wet and he thought Linnie had urinated on the bed. Sanders "kneed" Linnie off the bed and Linnie "hit the floor." He removed Linnie's clothes, wiped her body, clothed her with clean clothes, placed a cold cloth on her forehead, and took the sheets off the bed. Some-time during the night, Sanders thought he heard Linnie call his name. When Sanders later awoke, he told Linnie that he was going to get breakfast, but Linnie did not respond. When Sanders returned from getting food, Linnie was still in bed, non-responsive, cold, and not breathing. Sanders attempted CPR. He then sought help from the neighbors.

Sharon Burt, one of Sanders's neighbors, testified that she saw Sanders staggering a-round outside and that Sanders told her, "I think my wife is dead." Burt and Sanders walked to Sanders's house and Burt saw Linnie in bed with a huge, purple bruise on her forehead. Burt testified that Linnie's cheek was "ice cold." Burt saw the cur-tains hanging off the wall and Sanders told Burt that Linnie "does a lot of drugs" and "staggers all over the place" so the "curtains kind of fell down." Burt called 911. San-ders told Burt that he wanted to die and later told Burt, "I guess I'll be going to jail."

Paramedic Keith Morris testified that Sanders told him that he and Linnie took pills the night before; fought because he had hidden the pills; Linnie found the pills; and Sanders did not get his share of the pills. Deputy Craig Taylor testified that Sanders told him that

he and Linnie took prescription medications, argued over the medications, Linnie began falling down and passed out, and Sanders awoke the next day to find that Linnie was not awake and was non-responsive.  Sanders told Morris and Taylor that he "cleaned [Linnie] up to make her pretty."  Morris testified that Sanders cried.  Sanders told Taylor that he did not want to live without Linnie.

Deputy David Ramsey testified that he heard Sanders say that he tried to put Linnie in his truck, Linnie was wet, he tried to put clothes on Linnie, and he wanted to die because of Linnie's death.  Ramsey also heard Sanders tell a doctor that he and Linnie fought over drugs, that he had dragged Linnie and tripped over her, and that he thought he was supposed to let Linnie "sleep it off[.]"

Detective Christi Allen testified that she saw cuts or abrasions on Sanders's hands, which appeared to be from a fight or altercation and were consistent with someone who had been in a physical fight.  Captain Rickie Childers testified that it appeared as though a struggle, assault, or violence had occurred in the bedroom where Linnie's body was found.  Crime scene analysts testified that Linnie's blood and Sanders's blood was found on various items throughout the house.

Officers testified that what happened in the house was more than a drug overdose or a death from natural circumstances.  Witnesses testified that the scene appeared to have been cleaned and the body staged.  Law enforcement officers did not believe that Linnie accidently fell through the wall or died of an overdose.

Detective Craig Finegan testified that Sanders was originally charged with aggravated assault because Linnie's injuries indicated that she had been "beaten at the hands of someone" and Sanders was the last person to have contact with Linnie.  Finegan testified that, in a recorded conversation placed by Sanders from the jail, Sanders stated that he had "chunked [Linnie] around a lot."

J.C. Fleming, who shared a jail cell with Sanders, testified that Sanders told him that he came home from work and found Linnie had taken all the pills.  Sanders told Fleming that he was "p----- off about it" and he argued with Linnie.  Sanders told Fleming that he threw Linnie on the sofa, Linnie's head hit the table, he lifted Linnie to carry her to bed, he fell through the wall with Linnie, he pulled Linnie out of the wall, Linnie had splinters in her head, he threw Linnie on the bed, he placed a lit cigarette in Linnie's hand, he let the cigarette "burn down to the bone," he combed Linnie's hair, and he changed Linnie clothes.  Fleming testified that Sanders was not remorseful, but was angry and "wanted to kill people."  Fleming testified that Sanders was "talking about how he can ... get away with something and that they didn't have no evidence of what he was doing ... what he did."

Dr. Merrill O. Hines, III, an assistant medical examiner, testified that Linnie's injuries appeared to be recent, *i.e.*, at or following the time of death, and were caused by "inflicted, blunt-force trauma."  Hines testified that some of Linnie's injuries were consistent with being grabbed or moved.  Hines testified that Linnie's hair had been pulled out of her head, which caused bleeding under the scalp, that bleeding in Linnie's brain indicated significant force, and that the base of Linnie's neck was completely severed.  Hines explained that Linnie's hair loss is inconsistent with both falling and natural hair loss.  Hines testified that Linnie's particular neck injury is seen in cases of "very severe, blunt-force trauma," but because Linnie had a plate in her neck, less force than normal could have caused her injury.  Hines testified, "So the fact that those surgical

3

appliances were present made it more likely, in my opinion, that the injuries could have been inflicted versus the result of these extreme, usually accidental scenarios." Hines testified that it is unlikely that a person could harm herself to that extent.

Hines testified that Linnie had some injuries consistent with those sustained by intoxicated individuals, but that "the extent and magnitude of the injuries is far and above anything that I have seen in association with intoxicated individuals, and is beyond any scenario that I have heard of or read about of self-inflicted injuries, beyond somebody jumping off a building or something of that nature." Hines testified that toxicology reports did not show a lethal amount of drugs in Linnie's system and that drugs would not explain her death. Hines testified that intoxicated individuals rarely injure themselves severely and that it is extremely unlikely that Linnie fell and caused her injuries.

Hines opined that Linnie's injuries were caused by being accelerated, thrown, or forcibly pushed. Hines testified that Linnie's fracture patterns were consistent with the body being bent backward and were caused by external force applied to the body. According to Hines, being pushed into a wall of paneling could explain Linnie's head and neck injuries. Hines testified that if a person intentionally and knowingly inflicted Linnie's injuries, a reasonable person would anticipate that Linnie might die from the injuries.

Hines testified that Linnie's pattern of injuries does not comport with the story given, but are "suggestive more of a spectrum of inflicted injuries and subsequent manipulation of the body, which ... suggests that this was a homicide versus an accident." Hines concluded that Linnie "died as a result of blunt-force injuries and the associated hemorrhage and spinal cord trauma," "that it was a homicide[,]" and that Linnies injuries were "inflicted rather than accidental[.]"

Mark Jones, an investigator for the district attorney, testified that, on the day of trial, he was adjusting the courtroom projector when he heard Sanders say, "That is Linnie's mother, and I would like to tell her I'm sorry." Sanders testified that he worked as a machinist, which caused the marks on his hands. He explained that the curtain rod in the bedroom fell because individuals under the influence will hug the walls. He testified that Linnie had previously burned her fingers and would sometimes fall when under the influence. He admitted fighting with Linnie over drugs, but testified that this did not mean a "fistfight." He denied attempting to alter the scene or discard evidence. He denied telling Fleming that he killed Linnie, was angry with Linnie over the pills, tried to cover up the scene, or could have covered up the scene. Sanders admitted that he could have hurt Linnie by falling on her or throwing her on the bed, but he denied intentionally killing Lonnie.

Standard of Review

Title 28 U.S.C. § 2254 authorizes a district court to entertain a petition for writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment if the prisoner is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). The court may not grant relief on any claim that was adjudicated in state court proceedings unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law, or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if the state court reaches a conclusion opposite to a decision reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). An application of clearly established federal law is unreasonable if the state court identifies the correct governing legal principle, but unreasonably applies that principle to the facts. *Id*. An unreasonable application of law differs from an incorrect application; thus, a federal habeas court may correct what it finds to be an incorrect application of law only if this application is also objectively unreasonable. *Id*. at 409-411. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citation omitted). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. The Supreme Court has noted that this standard is difficult to meet "because it was meant to be." *Id*.

In addition, this court must accept as correct any factual determination made by the state courts unless the presumption of correctness is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e). The presumption of correctness applies to both implicit and explicit factual findings. *See Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004); *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001) ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.").

## Analysis

### *Failure to Give Jury Instruction*s

Initially, petitioner asserts the trial court erred by failing to provide the jury with instructions concerning the lesser-included offenses of manslaughter and criminally negligent homicide. He

states the evidence at trial, including his testimony and that of Dr. Hines, raised an issue regarding the lesser-included offenses.

Petitioner asserted this ground for review on direct appeal. The intermediate court stated that under Texas law, a lesser-included offense instruction should be given if: (1) the requested instruction is for a lesser-included offense of the charged offense and (2) there is some evidence that if the defendant is guilty, he is guilty only of the lesser-included offense. The court concluded that the offenses of manslaughter and criminally negligent homicide were lesser-included offenses of the offense of murder. However, the court concluded petitioner had not satisfied the second prong of the test. The court stated:

> To establish the second prong of the lesser-included offense analysis, Sanders contends that Fleming's testimony raises the issue of manslaughter and criminally negligent homicide because the jury could have concluded that Sanders did not knowingly or intentionally kill Linnie, but either recklessly or negligently caused her death when Linnie hit her head on the table or fell through the wall.

> However, given the evidence of Sanders's intent, Fleming's testimony does not demonstrate that Sanders is guilty of only manslaughter or criminally negligent homicide. Law enforcement officers observed evidence at the scene that indicated that Linnie's death was not accidental. Sanders told various witnesses that he fought with Linnie over drugs and that he became angry. Hines testified that Linnie's hair had been pulled out of her head, that her injuries were consistent with being grabbed, and that her injuries were caused by being accelerated, thrown, or forcibly pushed. Hines testified that Linnie's injuries were inflicted and intentional, not accidental. In light of other evidence showing that Sanders acted intentionally, the evidence does not show that, if Sanders is guilty, he is guilty only of acting recklessly or with criminal negligence.

It does not appear the intermediate appellate court misapplied state law. Moreover, even if the intermediate appellate court erred in applying state law, this would not provide petitioner with a basis for relief in this proceeding. In the course of reviewing state proceedings, federal habeas courts do "not sit as super state supreme courts to review error under state law." *Woods v. Dretke*, 503 F.3d 408, 414 (5th Cir. 2007).

In order to be entitled to relief with respect to his claim that the trial court erred by failing to provide instructions regarding lesser-included offenses, petitioner must demonstrate that the failure to provide such instructions implicated a federal constitutional right. "In a non-capital murder case, the failure to give an instruction on a lesser included offense does not raise a federal

constitutional issue." *Creel v. Johnson*, 162 F.3d 385, 390 (5th Cir. 1998) (quoting *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988)); *Garza v. Scott*, 41 F.3d 662 (5th Cir. 1994); *Clay v. Collins*, 988 F.2d 1212 (5th Cir. 1993).[1]  As a result, this ground for review does not provide petitioner with a basis for relief.

> *Error in Requiring Petitioner to Admit to Killing the Victim in Order to Receive Instructions Regarding Lesser-Included Offenses*

When petitioner's counsel requested the instructions regarding lesser-included offenses, the trial court inquired as to whether petitioner had to admit to killing the victim in order to be entitled to the instructions.  The prosecutor stated petitioner had not unequivocally admitted to causing the death of the victim.  Defense counsel stated petitioner was not required to make such an admission. The trial court denied the requested instruction.  Petitioner contends he was not required to admit to causing the death of the victim in order to receive the instructions.

As explained above, even if the trial court's belief that petitioner had to admit to killing the victim in order to receive the instructions regarding lesser-included offenses was erroneous under state law, this would not provide petitioner with a basis for relief.  In addition, as stated above, the trial court's failure to give an instruction regarding lesser-included offenses does not implicate a federal constitutional right.  This ground for review therefore does not provide petitioner with a basis for relief.

> *Admission of Hearsay Testimony*

Petitioner complains that the trial court improperly allowed hearsay testimony to be admitted into evidence.  He contends that witnesses Whitney Betros, Vance Berry, Sherry Spraybetty and

---

[1]    In *Creel*, the United States Court of Appeals for the Fifth Circuit held that a case where the death penalty is sought but not imposed is a non-capital case.  In *Creel*, the petitioner argued that the trial court erred by not providing a jury instruction on the lesser included offense of felony murder.  The Fifth Circuit applied *Valles* and held that in the petitioner's non-capital case, the failure to give an instruction regarding a lesser-included offense did not raise a federal constitutional issue.

In *Garza* and *Clay*, the Fifth Circuit applied *Valles* and held that a petitioner convicted of murder who asserted the trial court erred by failing to include an instruction on the lesser included offense of manslaughter did not raise a federal constitutional matter.  *Garza* and *Clay* were unpublished decisions.  However, as they were issued prior to January 1, 1996, they are precedent under Fifth Circuit Local Rule 47.5.3

Debra Sanders testified regarding statements made to them by the victim. The intermediate appellate court described the testimony to which petitioner objects as follows:

> Sanders challenges testimony provided by Whitney Betros, Debra Sanders, Deputy Vance Berry and Sherry Sprayberry. Specifically, Sanders complains of testimony that Linnie and Sanders fought, Sanders threatened Linnie, Sanders and Linnie argued over prescription medication, Linnie feared Sanders, Linnie feared for her life, Sanders abused Linnie, Sanders put a gun to Linnie's head, Linnie had a black eye, Linnie had to seek help with food and money. Linnie sometimes had bruises or cuts on her body, Sanders destroyed Linnie's photographs and threatened to burn her belongings, Linnie planned to leave Sanders, Sanders pushed Linnie, Sanders yelled obscenities at Linnie, Sanders threw a coral rock at Linnie, Linnie reported Sanders for assault and Linnie filed for a protective order against Sanders.

In order to be entitled to relief based on this ground for review, petitioner must do more than show that the admission of the testimony violated the Texas Rules of Evidence. State evidentiary rulings are not matters for federal habeas review unless they are of such magnitude as to constitute a denial of fundamental fairness under the Due Process Clause. *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992). The evidence in question must be a "crucial, critical, or highly significant factor" in the entire trial. *Id*. The test to apply is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted. *Rogers v. Lynaugh*, 848 F.2d 606, 609 (5th Cir. 1988).

Petitioner raised this ground for review on direct appeal. Noting that the erroneous admission of evidence was subject to harmless error review, the intermediate appellate court, citing *Taylor v. State*, 268 S.W.3d 571, 592 (Tex.Crim.App. 2008), stated that a verdict would not be overturned if the court had "fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but slight effect." In concluding that the verdict should be affirmed, the intermediate appellate court stated:

> The jury heard Sanders testify to some of the same facts as the other witnesses. Sanders testified that he and Linnie fought, they argued over drugs, Linnie filed charges against him, Linnie sought a protective order against him, and he threw a rock at Linnie. Sanders did not dispute that he had threatened Linnie or been physically abusive in the past. During closing argument, the State did not emphasize the prior instances of abuse, but focused on the events surrounding Linnie's death. Additionally, the record contains other evidence from which the jury could conclude that Sanders committed the offense of murder. Based on the record, the complained-of testimony either did not influence the jury or had but slight effect.

In concluding that the hearsay testimony "either did not influence the jury or had but slight effect," the intermediate appellate court, in essence, concluded there was not a reasonable probability the result of the proceeding would have been different if the hearsay testimony had not been admitted. As petitioner himself testified as to some of the matters covered by the hearsay testimony, and as there was evidence in the record exclusive of the hearsay testimony to support the jury's verdict, it cannot be concluded that the conclusion of the intermediate appellate court was contrary to, or involved an unreasonable application of, clearly established federal law.

*Prosecutorial Misconduct*

A. Use of Extraneous Offense Evidence

Petitioner states that during trial, the prosecutor asked Debra Sanders about a burglary she alleged petitioner had committed. The prosecutor also elicited testimony from Deputy David Ramsey that Debra Sanders had told him petitioner had threatened to kill her and had shot at her residence. He also states the prosecutor had Whitney Betros, the victim's daughter, testify that petitioner had threatened to pull a knife on her and her boyfriend. Petitioner contends that as the record contains no complaints or filed reports relating the alleged burglary, the alleged threat to kill Debra Sanders and firing a gun at her residence and the alleged threatening of Ms. Betros and her boyfriend with a knife, reference to these extraneous offenses was improper.

While petitioner complains that no complaints or filed reports were admitted into evidence to support the testimony of Debra Sanders, Deputy Ramsey and Ms. Betros concerning extraneous acts, he has not cited any statutes or cases that demonstrate Texas law required that their testimony be supported by complaints or filed reports. As a result, it cannot be concluded the prosecution acted improperly by eliciting such testimony. The rejection of this ground for review by the state courts was therefore not contrary to, and did not involve an unreasonable application of, clearly established federal law.

B.  Reference to Possible Confession

Petitioner states that during trial, the prosecutor asked Detective Craig Finegan of the Polk County Sheriff's Department whether petitioner said anything during his initial interview that a trained officer would deem a confession.  Detective Finegan gave an affirmative response, but did not describe what petitioner had said.  Petitioner contends this misled the jury and caused them to believe that petitioner has possibly confessed to the crime.

This ground for review is not supported by the record.  Detective Finegan testified twice at trial.  He stated that he had interviewed petitioner.  However, the prosecutor never asked him the question petitioner describes.  Further, Detective Finegan never stated or implied that petitioner had confessed.  As the exchange between Detective Finegan and the prosecutor that petitioner describes did not take place, the state courts' rejection of this ground for review was not contrary to, or an unreasonable application of, clearly established federal law.

C.  Misstatement of the Law

Petitioner states that during the charge conference, the prosecutor erroneously told the court that in order to be entitled to an instruction on the lesser-included offenses of manslaughter and negligent homicide, petitioner had to commit to having committed murder.  Petitioner complains that this was a misstatement of the law.

The discussion at the charge conference regarding defense counsel's request for an instruction regarding the lesser-included offenses of manslaughter and negligent homicide is set forth below:

THE COURT: You are wanting an instruction for a criminally negligent homicide and manslaughter?  Doesn't he have to agree that he killed her first in order to get those?

DEFENSE COUNSEL: Not with–manslaughter, yeah.  He says–I will show you the definition of manslaughter.

THE COURT: Okay.

DEFENSE COUNSEL: That's not manslaughter.  A person commits an offense if he recklessly causes the death of an individual.  There is no requirement that he has to say, "I killed the individual."  You have to request it.  He did testify to what constitutes negligence.  The same thing with the–and the–I'm sorry.  The prime example is I said

10

homicide. He also said homicide in Texas includes negligent–criminally negligent homicide. We have evidence of both of these from Del Ray Sanders' testimony. Other than that, we've got the other people that said what he said, too.

THE COURT: I've got it. I'm writing on these [the proposed instructions] denied. That way you will have a record of them.

DEFENSE COUNSEL: That's fine.

THE COURT: I'm sure that's what you wanted me to do right.?

DEFENSE COUNSEL: Yes, Your honor, if you don't mind. That should reduce the argument to 15 minutes.

PROSECUTOR: Judge, I would tend to agree with the Court on the status of the evidence in this case. I don't think there is any type of unequivocal admission on the defendant's part that he caused the death of Linnie Sanders that would warrant [the] giving of a manslaughter instruction. While he certainly indicates that he may have done different things to cause her injury, you know, here again, I think he has [not] conceded that he killed her.

DEFENSE COUNSEL: In response, I am unaware of any requirement that he agree he killed her for either of these–to get either instruction.

PROSECUTOR: Based on his testimony, the inference would be that she caused her own injury that ultimately resulted in her death when she slipped and fell or hit her head on this coffee table, as I recall, which he doesn't claim to have any responsibility for one way or the other.

THE COURT: I'm going to deny your request for a lesser included.

Reporter's Record ("RR"), Vol. 5 at 222-23.

As Justice Johnson points out in her dissent from the refusal by the Court of Criminal Appeals to grant the petition for discretionary review, the trial court's belief that petitioner had to admit to killing the victim in order to be entitled to an instruction on lesser-included offenses, and the prosecutor's remarks in support of that belief, were erroneous. However, the portion of the transcript quoted above demonstrates the trial court's statements concerning the state of the law was based on its own view of the law and that the trial court had decided to deny the request for an instruction regarding lesser-included offenses before the prosecutor made his remarks. Moreover, the intermediate appellate court determined petitioner was not entitled to an instruction regarding lesser-included offenses because the evidence did not support such an instruction, not because petitioner had not admitted to killing the victim.

11

As the trial court decided to deny the request for an instruction regarding lesser-included offenses before the prosecutor made his remarks, and as the intermediate appellate determined the instruction was not appropriate without relying on the trial court's erroneous view of the law, petitioner suffered no prejudice as a result of the prosecutor's misstatement of the law. The rejection by the state courts of this ground for review therefore was not contrary to, and did not involved an unreasonable application of, clearly established federal law.

    D. <u>Failure to Timely Turn Over Photograhs</u>

Petitioner states that prior to trial, his attorney filed a motion seeking production of all evidence connected to the case and in the possession of the state or affiliated agencies. He states that on the third day of trial, witnesses called by the prosecution told the jury they had taken photographs of the crime scene, petitioner's truck and items located in the truck. A forensic scientist testified that the photographs had been in her computer and in her vault. The prosecutor told the court that he only found out about them the day before trial. However, petitioner states the prosecutor's witness list included the names of the crime scene investigators and that prosecutor had the initial reports of the investigators long before trial. Defense counsel told the court he had never seen the photographs and unsuccessfully requested a mistrial. Petitioner contends that failure to provide the photographs prior to trial was improper.

Petitioner states the photographs included general shots of the condition of his house and vehicle when the authorities arrived and shots of specific physical items in the back of his vehicle that the authorities and prosecution claimed potentially had evidentiary value. He states the items included a red-stained rag, strands of unidentified hair and a baseball bat. There was testimony that the items were sent to a crime lab and found to have no evidentiary value. However, some witnesses testified that the testing had not been completed. He asserts that as a result of the photographs, the jury believed the red stains were blood, the bat was used to kill the victim, and the strands of hair belonged to the victim and had been violently detached from her head.

During the testimony of Tanya Dean, a forensic scientist at the Texas Department of Public Safety Crime Lab in Houston, reference was made to 167 photographs. Ms. Dean testified that she was present at the crime scene and that the photographs were a fair and accurate representation of the crime scene. She further testified that the photographs had been kept in a secured vault and had been picked up by the Polk County Sheriff's Department the day before she testified.

Valerie Huebner, another employee at the crime lab, testified concerning the photographs. She stated some of the photographs had been taken at the crime scene and that some of the photographs were taken in the crime lab of objects recovered from the crime scene. The prosecutor stated he had received the photographs the previous morning.

With respect to the items referenced by petitioner, Ms. Huebner testified that one of the photographs was of a burp cloth or some type of rag that was found in the back of petitioner's truck. She stated nothing of forensic value was extracted from the cloth. She testified there was no blood or fibers on the bat and that the bat did not appear to have any connection to the crime. She further testified that the hair found in the back of the truck was the same color and consistency as that of the victim.

Despite petitioner's assertion, there was no evidence that would have led the jury to believe that the blood on the burp cloth was that of the victim. Nor was there any evidence to indicate that the bat found in the back of the truck had been used to strike the victim. While there was evidence that indicated the hair found in the back of the truck belonged to the victim, there was no indication that the hair had been violently detached from her head. As a result, it cannot be concluded that the admission of the photographs caused petitioner to suffer prejudice, particularly as he has failed to demonstrate how his trial strategy would have been different if he had received the photographs well before trial. He has not explained how having additional time to examine the photographs would placed him in a better position to attack their evidentiary value. In the absence of any indication as to how not receiving the photographs until after the trial had begun resulted in prejudice to petitioner, the rejection by the state courts of this ground for review was not contrary to, and did not involve an

unreasonable application of, clearly established federal law.

    E.  <u>Racial Comment and Implications of Extraneous Racist Conduct</u>

Petitioner states that while the prosecutor was cross-examining him, he made a racial comment and implied petitioner was prejudiced against blacks because of remarks petitioner allegedly made during a phone conversation from the jail and had fought blacks because of their race. Petitioner contends the statements were improper, particularly as the jury contained a significant number of African Americans.

During cross-examination, the following exchange took place between the prosecutor and petitioner in reference to testimony by J.C. Fleming, a jail house informer:

Q: He also testified that you picked her [the victim] up and threw her on the divan or the couch. Did you tell him that?

A: He heard a lot of things that I–I was mainly talking to–I'm not a prejudiced person, but I was mainly talking to the white people in there because I had been told that J.C. had been an informer and had told on people before in the jail to get out of some of his sentences.

Q: You are not a prejudiced person? Did I just hear you say that?

A: Yeah, not really.

Q: It is certainly not reflected in these phone conversations is it?

A: How is that?

Q: You certainly don't mind using disparaging remarks toward black people do you?

A: Well, how is that? How did I use any remarks against black people or anything?

Q: You were–you assaulted a black man, didn't you?

    DEFENSE COUNSEL: Objection, Your Honor, irrelevant.

A. In prison? I mean, in jail?

Q: In the Polk County jail.

A: You know why-

    THE COURT: Hold on. I will sustain the objection. Ask your next question, please.

Q: Were you upset because you were in the cell with a black man?

A: No.  There was all kinds of black people.  We–they just don't put white people in one cell in there.

Q: Did you punch a guy because he is black?

A: Which guy?

Q: How many were there?

     DEFENSE COUNSEL: Objection, Your Honor, irrelevant.

A: Who are you talking about?  J.C. or-

     THE COURT: Thank you.  Hold on.  Hold on.  Do you have an objection?

     DEFENSE COUNSEL: Irrelevant, Your Honor.

     THE COURT: I'll sustain at this point in time.

RR, Vol. 5 at 190-91.

When petitioner stated he was not a prejudiced person, he opened the door to further cross-examination on this point.  The court sustained objections to one of the prosecutor's questions and eventually indicated the matter had been pursued far enough.  However, the prosecutor's exploration of this topic was not improper in light of petitioner's statement.  Further, in light of the limited amount of time the prosecutor was given to pursue this line of inquiry, it cannot be concluded petitioner suffered prejudice as a result of the prosecutor's statements.  The rejection of this state courts of this ground for review was therefore not contrary to, or an unreasonable application of, clearly established federal law.

F.  <u>Erroneous Characterization of Petitioner as Evil</u>

During closing arguments during the punishment stage of the trial, the prosecutor made the following remarks:

> There are a lot of people that we prosecute in this courtroom down here that are guilty of doing bad things, stupid things, mistakes in judgment, things that are hurtful to other people.  But then, there are a few people that we prosecute down here that can be characterized as truly evil.  And I would suggest to you that, based on the evidence that you have heard in this case, this is one of those people sitting in front of you right now.  And that is a term "evil" that I don't use loosely or frequently in closing arguments such as this.  But I don't hesitate whatsoever to use it in regard to a description of Del Ray Sanders.

15

RR, Vol. 6 at 77-78. The prosecutor later said petitioner had an "evil heart." Petitioner contends these statements were improper and inflammatory.

Under Texas law, a prosecutor may present argument to the jury on four types of issues: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's arguments; and (4) pleas for law enforcement. *Moody v. State*, 827 S.W.2d 875, 894 (Tex. Crim.App. 1992). The evidence introduced at trial regarding petitioner's conduct in this matter has been summarized above. While the prosecutor's remarks could be characterized as exagerated, they constituted reasonable deductions from the evidence. Accordingly, the state courts' determination that this ground for review was without merit was not contrary to, nor an unreasonable application of, clearly established federal law.

*Ineffective Assistance of Counsel*

A. Legal Standard

In order to establish an ineffective assistance of counsel claim, a petitioner must prove counsel's performance was deficient, and that the deficient performance prejudiced petitioner's defense. *Strickland v. Washington*, 466 U.S. 668 (1984). As a petitioner must prove both deficient performance and prejudice, failure to prove either will be fatal to his claim. *Johnson v. Scott*, 68 F.3d 106, 109 (5th Cir. 1995).

Judicial review of counsel's performance is highly deferential. *Strickland*, 466 U.S. at 689. There is a strong presumption counsel rendered reasonable, professional assistance and that the challenged conduct was the result of a reasoned strategy. *Id*.; *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). To overcome the presumption that counsel provided reasonably effective assistance, a petitioner must prove counsel's performance was objectively unreasonable in light of the facts of the case. *Strickland*, 466 U.S. at 689-90. A reasonable professional judgment to pursue a certain strategy should not be second-guessed. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).

In addition to demonstrating counsel's performance was deficient, a petitioner must also show prejudice resulting from the inadequate performance. *Strickland*, 466 U.S. at 691-92. A petitioner

must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A petitioner must show a substantial likelihood that the result would have been different if counsel had performed competently. *Harrington v. Richter*, 562 U.S. at 110.

B. At Trial

1. Failure to Request Change of Venue

Initially, petitioner asserts trial counsel was ineffective for failing to request a change of venue. Petitioner states he was charged with murder in Polk County, which had a population of approximately 43,700 people. He states the local newspaper featured the incident on its front page for several consecutive weeks, including pictures of petitioner and the victim and full details of the violent nature of the victim's death. Petitioner states that during the pretrial stage he repeatedly asked his counsel to request a change of venue because he did not believe he could receive a fair trial. He told counsel that it would not be a problem to secure affidavits from credible members of the community concerning the difficulty in having a fair trial. He states his attorney merely responded that the trial court would not allow a change of venue.

Petitioner states that 60 prospective jurors were summoned. During *voir dire*, multiple members of the panel stated they had heard of or read about the case. He states some members of the panel stated they would have difficulty in putting aside what they had heard about the case. He states prospective juror 9, who became the foreperson of the jury, stated "she could not say" whether she could disregard what she had heard because she had "read a lot."[2] She also stated she knew some of the prosecution's witnesses and knew the assistant deputy chief of the sheriff's department. He states prospective juror 16 said she could set aside what she had previously heard. He states that while the

---

[2] This misstates the answer prospective juror 9 gave. She was asked whether she could put aside what she had read and be a fair juror to both sides. She stated: "I don't really remember what I read. I have got to try to remember what I read from 'Polk County Entperprise.' I read a lot. I couldn't tell you." RR, Vol. 2 at 50. She was then asked again whether she could put what she read aside and listen to the evidence. She gave an affirmative response.

17

court struck prospective juror 8 after he was challenged, counsel failed to challenge or strike other prospective jurors.

Article 31.03(a) of the Texas Code of Criminal Procedure provides that in order to be entitled to a change of venue, a defendant must file a:

> written motion, supported by his own affidavit and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes, the truth and sufficiency of which the court shall determine: (1) that there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial; and (2) that there is a dangerous combination against him instigated by influential persons, by reason of which he cannot receive a fair trial.

While petitioner states he told counsel credible persons could have been located to provide the required affidavits, he had not identified any such persons or provided any affidavits from them. Petitioner's failure to provide such affidavits or even name individuals who would have been willing to provide them prevents the conclusion that he suffered prejudice as a result of counsel's failure to file a motion for change of venue. *Pool v. Thaler*, 2010 WL 2671297, at *4 (N.D. Tex. June 30, 2010). The determination of the state courts regarding this ground for review was therefore not contrary to, and did not involve an unreasonable application of, clearly established federal law.

2. Failure to Strike Biased Prospective Juror

Petitioner states prospective juror 9, who became the foreperson of the jury, stated she had been the victim of physical domestic abuse at the hands of a male with whom she had previously been in a relationship. She stated she filed charges against the person and sought two protective orders. The abuser pled guilty, but was only placed on probation. The protective orders were filed with the same district attorney's office that was prosecuting petitioner.

Prospective juror 9 stated she knew about the case from reading the newspaper and knew some of the prosecution's witnesses. She stated she could be fair, but felt that something had happened between petitioner and the victim and said she could hold petitioner accountable if she felt he had done something wrong.

Petitioner states defense counsel unsuccessfully attempted to have prospective juror number 9 stricken for cause. He asserts counsel should have used a peremptory strike against her because she had been subjected to events which were too similar in nature to the case being tried. Instead, counsel used his strikes against less objectionable prospective jurors.

During *voir dire*, the following exchanges took place:

VENIREPERSON NO. 9: I think I kind of fall under that. It's been a few years ago. A relationship I was in, I had to file a protective order against him. He was–well, he pled guilty to it; but he was given probation. I think I fall in that.

PROSECUTOR: You applied for a protective order?

VENIREPERSON NO. 9: A protective order, yes.

PROSECUTOR: Was that through our office?

VENIREPERSON NO. 9. Yes. There was two of them. It's been a while back. I forget the lady's name downstairs, Elina-

PROSECUTOR: Ms. Elina Hobbs?

VENIREPERSON NO. 9: Yes.

PROSECUTOR: You were a victim or someone hurt you or was harassing you?

VENIREPERSON NO. 9: Was harassing me. It was for harassment.

PROSECUTOR: Is that the type [of] circumstance that myself or [defense counsel] need to be concerned about in terms of your ability to be a fair juror in this case, either to the prosecution or–

VENIREPERSON NO. 9: I personally don't feel that way. That's why I had you explain.

RR, Vol. 2 at 82-83.

VENIREPERSON NO. 9: I know him [referring to prosecution witness Byron Lyons]. We use to go to church.

DEFENSE COUNSEL: Would the fact–

VENIREPERSON NO. 9. Used to.

DEFENSE COUNSEL: Would that affect your ability to be fair to Mr. Sanders.

VENIREPERSON NO. 9: No.

DEFENSE COUNSEL: Would that fact that you know him, if Mr. Lyons testifies, would the fact that you know him would it make you more likely than you otherwise would be

to convict Mr. Sanders:

VENIREPERSON NO. 9: Are you saying I would just say whatever he said was just in cement?

DEFENSE COUNSEL: Right.

VENIREPERSON NO. 9: No.

DEFENSE COUNSEL: You wouldn't?

VENIREPERSON NO. 9: No.

DEFENSE COUNSEL: You could disregard your personal relationship and listen to his testimony?

VENIREPERSON NO. 9: Yes.

RR, Vol 2 at 105-106.

DEFENSE COUNSEL: Yes, ma'am. How do you know him [prosecution witness J.C. Flemming].

VENIREPERSON NO. 9: I just–I just know him. I have known him from years from way back in school.

DEFENSE COUNSEL: Without telling me what you know about him, would your knowledge of him be such that if he testified you would be more likely because of your knowledge of him to convict Mr. Sanders than you would otherwise be?

VENIREPERSON NO. 9: No. I mean, my knowledge of him-

DEFENSE COUNSEL: Don't–yeah. Don't tell me the circumstances.

VENIREPERSON NO. 9: No. No. Just like the gentleman just said, it's-if I am-if I'm on there, it is the facts, not just what somebody says.

RR, Vol. 2 at 114.

THE COURT: Hi. How are you doing, Ms. White? You–I show that you have heard about the case.

VENIREPERSON NO. 9: I had remembered reading it on "Polk County Today."

THE COURT: Based upon what you have read, have you already formed an opinion as to whether or not this gentleman is guilty or not of this offense?

VENIREPERSON NO. 9: Actually, I've forgotten about it.

THE COURT: Okay. And you said you might know a potential witness.

VENIREPERSON NO. 9: J.C. Fleming. I just know him from the community.

THE COURT: All right.

VENIREPERSON NO. 9: In that same neighborhood.

THE COURT: And that doesn't affect–what you might know of this person doesn't affect you ability to be fair and impartial?

VENIREPERSON NO. 9: No, sir.

DEFENSE COUNSEL: May I?

THE COURT: Go ahead.

DEFENSE COUNSEL: Ma'am, I also understand that–were you a victim of domestic violence:

VENIREPERSON NO. 9: No. Well, this is the question. This is what it was. I was in a relationship, and we split up. And my charges were harassment, verbal harassment. He called me all the time and coming by my house. And so, I filed a restraining order. It wasn't a trial. He just pled guilty. He was given a probated sentence. And that's all it was.

I mean, he did go to prison, but it wasn't related to mine. He had committed a violent crime against somebody else.

DEFENSE COUNSEL: Ma'am, back to the original question. Is there a possibility if you are back on the panel and remember something in the newspaper and you tell the other jurors?

VENIREPERSON NO. 9: No.

DEFENSE COUNSEL: You won't do that?

VENIREPERSON NO. 9. No, sir. I personally feel I could be fair. That's how I feel. If it was me, I would just want you to be fair.

RR, Vol 2 at 169-170.

The use of peremptory challenges is usually a matter of trial strategy which a federal court considering a habeas petition is reluctant to second guess. *Tolliver v. United States*, 2009 WL 1393300, at *6 (S.D. Ill. May 15, 2009). The exchanges quoted above demonstrate that propective juror 9 consistently said she could disregard her personal history, as well as her prior knowledge of the case and witnesses, and be fair to petitioner. In light of her statements, it cannot be concluded counsel's failure to use a peremptory strike against her resulted in a biased juror considering petitioner's case. In addition, while petitioner states counsel used his peremptory strikes against less

objectionable jurors, he has not identified these individuals or attempted to explain why they were less objectionable than prospective juror number 9. He has therefore failed to demonstrate he suffered prejudice because a peremptory strike was not used against her.

In light of the deference owed to counsel's strategic choices, the record does not demonstrate counsel's failure to use a peremptory strike against prospective juror number 9 fell below an objective standard of reasonableness. Nor has petitioner shown it resulted in prejudice. As a result, the adjudication by the state courts of this ground for review was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

3. Failure to Interview, Subpoena and Call Defense Witnesses

Petitioner states that before trial, he asked counsel to interview and call Dennis Williams, Bobby Nixon, Matt Bishop and Seth Evans. He states these individuals were placed on a supplemental list of witnesses, but were not interviewed or called to testify. He states they could have rebutted the following evidence introduced by the prosecution: (a) that petitioner made certain incriminating statements during a phone conversation with Mr. Williams while petitioner was in the county jail; (b) that petitioner always exhibited abusive behavior towards the victim and (c) that petitioner's sister had no bias or interest in testifying against him.

During the testimony of Detective Craig Finegan, the prosecution introduced a recording of a conversation between petitioner and Mr. Williams. Petitioner states that during his testimony he challenged the prosecution's interpretation of his statements during the conversation and attempted to clarify the context in which they were made. He states that if Mr. Williams had been called to testify, he would have clarified what petitioner's statements actually meant because he understood petitioner's hyperbolic language as a result of being a close friend. Petitioner states Messrs. Bishop and Nixon would have testified as to the loving relationship between petitioner and the victim. Mr. Evans, an attorney who represented petitioner and the victim in a civil matter, would have rebutted testimony that the victim's mother caused a lawsuit against petitioner's sister to be dismissed.

Petitioner states he also asked counsel to locate an expert witness to determine whether a red substance found on a cloth in the back of petitioner's truck was the victim's blood. However, counsel failed to do so. Nor did counsel seek an opinion from a neutral medical expert as to the time of the victim's death and the cause of the victim's blunt-force trauma.

Complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of witnesses is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008)). To prevail on an ineffective assistance counsel claim based on counsel's failure to call a witness, the petitioner must identify the witness, demonstrate that the witness was available to testify and would have done so, set out the contents of the witness's proposed testimony and show that the testimony would have been favorable to a particular defense. *Id*. (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). This requirement applies to both lay and expert witnesses. *Evans v. Cockrell*, 285 F.3d 370, 377-78 (5th Cir. 2002) (rejecting uncalled expert witness claim when the petitioner failed to present evidence of what a scientific expert would have stated). The requirements of showing availability and willingness to testify "[are] not a matter of formalism." *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). A petitioner must present evidence on these points as part of the burden of proving trial counsel could have found and presented a favorable witnesses, including an expert witness. *Id*.

With respect to Messrs. Williams, Nixon, Bishop, and Evans, petitioner has submitted no evidence demonstrating these individuals were available to testify and would have done so. In addition, while petitioner has described the testimony these witnesses would have provided, he has not submitted affidavits from them setting forth their testimony. The failure to produce an affidavit from an uncalled witness is generally fatal to allegations of ineffective assistance in this context. *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983). With respect to the expert witnesses petitioner identifies, he has not identified any individuals who could have been called to testify or demonstrated they were available and willing to testify. Nor has he set forth the contents of the

testimony that the experts would have provided. As a result, the rejection by the state courts of this ground for review was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

    4. <u>Failure to Investigate and Prepare a Meaningful and Effective Trial Strategy</u>

    a. <u>Testimony of Debra Sanders</u>

Petitioner states that Debra Sanders, his sister, testified over his objection that he was abusive to the victim and neglectful of the nutritional needs of the victim and her daughter. She also testified petitioner had burglarized her home. He states that on cross-examination, she testified that she was psychic and had previously been arrested on petitioner's property. She denied having a certain enthusiasm for testifying against petitioner, but acknowledged that she believed petitioner had convinced the victim to file a lawsuit against her seeking $80,000.

Petitioner states counsel failed to ask Debra Sanders about her prior arrests or convictions. He states Debra Sanders had one or more felony convictions, which counsel would have discovered if he had investigated her background. He also states a proper investigation would have discovered admissible evidence showing she was biased against petitioner.

As described above, Sherry Sprayberry, Whitney Betros and Vance Berry also testified about petitioner's abuse of the victim, making the testimony of Ms. Sanders cumulative. Further, Ms. Sanders did not state petitioner had burglarized her home or that she believed petitioner had convinced the victim to file a lawsuit against her.[3] In addition, Ms. Sanders' denial of having a certain enthusiasm about testifying against petitioner and her testimony regarding being arrested on petitioner's property were given during the punishment phase of the trial rather than the guilt/innocence phase. Finally, petitioner does not identify any of his sister's prior convictions. Nor does he provide any support for his assertion that she had prior convictions that could be used for impeachment purposes. Based on the foregoing, it cannot be concluded counsel's alleged failure to

---

    [3] Ms. Sanders was asked who she believed had caused the lawsuit to be filed. She began to answer the question, but before she named any individual the court sustained an objection to the question.

properly prepare for his cross-examination of Ms. Sanders caused petitioner to suffer prejudice. The state courts' rejection of this ground for review was therefore not contrary to or an unreasonable application of, clearly established federal law.

      b.  <u>Not Being Prepared to Force the Prosecution to Select a Specific Theory Regarding the Murder</u>

Petitioner states counsel failed to properly prepare for a request to have the prosecution make an election as to the specific manner and means of the murder. The indictment alleged petitioner caused the death of the victim by inflicting blunt-force trauma by: (1) striking the victim with an object unknown to the grand jury or (2) causing the victim's body to strike an object unknown to the grand jury. Petitioner asserts counsel should have been prepared to force the state to elect which method of causing the victim's death it wished to include in the jury charge.

Under Texas law, the prosecution is not required to elect a single manner of committing an offense to include in the jury charge where the indictment charged separate manners of committing the same offense. *Rodriguez v. State*, 970 S.W.2d 66, 69 (Tex.App.-Houston 1998) (various methods of committing a crime may be alleged "and [the prosecution] may not be forced to elect a particular method on which to prosecute."); *Sperling v. State*, 924 S.W.2d 722, 727 (Tex.App.-Amarillo 1996) (various methods of committing an offense may be alleged in one indictment and "the State need not elect between the various theories alleged" and "the jury may consider all theories and return a general verdict of guilty."). As a result, counsel's failure to force the prosecution to choose a single method of committing the murder to include in the jury charge did not fall below an objective standard of reasonableness. The adjudication by the state courts of this ground for review was therefore not contrary to, or an unreasonable application of, clearly established federal law.

      c.  <u>Failure to Establish Defense Strategy or Working Relationship with Petitioner</u>

Petitioner states that during the entire pretrial period, counsel did not contemplate a defensive strategy or establish a genuine working relationship with petitioner. This resulted in a complete absence of adversarial force against the prosecutions's allegations. Petitioner states that during trial witnesses repeated certain terms and verbiage used by petitioner during the day of the murder and

while he was in the county jail.  This was done in an attempt to cast petitioner's words and expression in a negative light and different context than that in which they were used.

Petitioner states that when he was testifying, he used terms expressing what had happened during his relationship with the victim and on the day she died.  Despite the prosecutor's attempt to make petitioner's hyperbolic language appear incriminating, he consistently explained the true meaning of the terms he used.  He states that during his examination, counsel did not attempt to revisit the terms and expressions used by prosecution witnesses to place them in their proper context and diminish any incriminating inferences that might have been drawn from them.

Petitioner further states that during closing arguments, the prosecutor attempted to place petitioner's words in a negative light without any objection from defense counsel.  He also states defense counsel made no attempt to draw the jury's attention back to evidence that could have plausibly explained the reasons for his acts or omissions.

Finally, petitioner states that because counsel rarely visited him and failed to form a working relationship with him, he did not have an opportunity to become familiar with petitioner's hyperbolic expressions.  This made it difficult for him to rebut the inferences the prosecutor wanted the jury to draw from the expressions.

Petitioner's assertion that counsel's failures resulted in a complete absence of adversarial force against the prosecution's allegations is incorrect.  Defense counsel presented witnesses on petitioner's behalf and vigorously cross-examined the prosecution's witnesses.  In addition, counsel presented a cogent closing argument that summarized the evidence from petitioner's perspective and provided reasons for the jury to conclude the prosecution had not met its burden of proof.  Counsel's representation of petitioner therefore did not fall below an objective standard of reasonableness. Moreover, as described above, there was significant evidence demonstrating that the death of the victim was not the result of an accident, but was caused by petitioner's intentional acts.  In light of the evidence against petitioner, there is not a reasonable probability petitioner would have been acquitted if counsel had taken the additional steps described in this ground for review.  Accordingly,

the rejection of this ground for review was not contrary to, or an unreasonable application of, clearly established federal law.

B. On Appeal

On appeal, petitioner asserted grounds for review attacking the jury instructions and complaining of the admission of hearsay testimony. He states appellate counsel was ineffective for failing to raise claims regarding the sufficiency of the evidence and ineffective assistance of counsel.

For the reasons set forth above, petitioner's claims based on ineffective assistance of counsel are without merit. As a result, appellate counsel's failure to assert them did not fall below an objective standard of reasonableness or cause petitioner to suffer prejudice. Moreover, petitioner makes no attempt to explain why he believes there was not sufficient evidence to sustain his conviction. Accordingly, it cannot be concluded that the failure to raise this claim resulted in prejudice. The adjudication by the state courts of this ground for review was therefore not contrary to, and did not involve an unreasonable application of, clearly established federal law.

Conclusion

For the reasons set forth above, this petition for writ of habeas corpus is without merit. A final judgment will be entered denying the petition.

In addition, the court is of the opinion petitioner is not entitled to a certificate of appealability in this matter. An appeal from a judgment denying federal habeas relief may not proceed unless a judge issues a certificate of appealability. 28 U.S.C. § 2253. The standard for a certificate of appealablilty requires the petitioner to make a substantial showing of the denial of a federal constitutional right. *See Slack v. McDaniel*, 529 U.S. 473, 483-84; *Elizalde v. Dretke*, 362 F.3d 323, 328 (5th Cir. 2004). To make a substantial showing, the petitioner need not demonstrate that he would prevail on the merits. Rather, he must demonstrate that the issues he raised are subject to debate among jurists of reason, that a court could resolve the issues in a different manner, or that the questions presented are worthy of encouragement to proceed further. *See Slack*, 529 U.S. at 483-84. Any doubt regarding whether to grant a certificate of appealability should be resolved in favor of the

petitioner and the severity of the penalty may be considered in making this determination. *See Miller v. Johnson*, 200 F.3d 274, 280-81 (5th Cir. 2000).

In this case, the petitioner has not shown that the issues he raised are subject to debate among jurists of reason. The factual and legal issues raised by petitioner have been consistently resolved adversely to his position and the questions presented are not worthy of encouragement to proceed further. As a result, a certificate of appealability shall not issue.

**SIGNED** this the **16** day of **March, 2017.**

Thad Heartfield
United States District Judge